UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

ROY LEE WILLIAMS                      CIVIL ACTION NO. 11-cv-1858

VERSUS                                JUDGE FOOTE

WARDEN, LOUISIANA STATE               MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

**Introduction**

Mrs. Avis Foster, age 73, was kidnapped from the Coushatta home that she shared with her invalid husband.  She was beaten, raped, and strangled, and her body was found abandoned in neighboring Natchitoches Parish.  Paroled rapist Roy Lee Williams ("Petitioner") was developed as a suspect and arrested on an outstanding parole warrant. Petitioner made statements to investigating officers in which he admitted taking Mrs. Foster's car but denied killing her.  DNA samples taken from the victim's body and Petitioner's clothing linked him to the crime.

Petitioner was charged with first-degree murder and faced the death penalty.  He eventually entered a plea of guilty to first-degree murder, reserving his right to appeal certain pretrial issues, in exchange for a life sentence and the dismissal of an aggravated kidnapping charge.  The State reserved the right to seek the death penalty pending the outcome of any appeal.  Petitioner nonetheless appealed and challenged the denial of his motion to suppress statements made to police.

The Second Circuit Court of Appeal, in a 2-1 panel decision, held that the motion to suppress should have been granted.  On rehearing, The court held 3-2 that the trial court was correct to hold the statements admissible.  State v. Williams, 965 So.2d 541 (La. App. 2d Cir. 2007).  The Supreme Court of Louisiana denied writs without comment, although two justices (Calogero and Johnson) voted to grant the writ.  978 So.2d 347 (La. 2008). Petitioner then filed a post-conviction application, which was denied.

He now seeks federal habeas relief on the grounds that (1) statements made by him were inadmissible; (2) Red River Parish was not the proper venue for the prosecution; and (3) ineffective assistance of counsel.  The principal claim is that police violated Edwards v. Arizona, 101 S.Ct. 1880 (1981), which generally provides that if a suspect invokes his Fifth Amendment right to counsel police may not continue to question him unless the accused himself initiates further communication with the police. For the reasons that follow, it is recommended the petition be denied.

**The Motion to Suppress Statements**

### A. Relevant Facts

After Petitioner was developed as a suspect, a Red River Parish deputy learned of an outstanding parole violation warrant that had issued for Petitioner several weeks earlier.  The search for Petitioner led to Alexandria, in Rapides Parish, where OnStar indicated the victim's car was located.  The car was stopped, and the driver told police that he got the car from Gordon Foster (the name of the victim's husband).  The driver was shown a photo lineup and asked to identify Mr. Foster.  He pointed to a picture of Petitioner.  An Alexandria

police officer soon located Petitioner on the evening of February 3, 2004, arrested him, and took him to the Alexandria Police Department.

Sheriff's deputies from Red River and Natchitoches Parishes jointly investigated the crime.  Travis Trammell (Natchitoches) and Tracy Scott (Red River) met with Petitioner that evening at the Alexandria Police Department after Petitioner was picked up on the parole violation warrant.  Trammell advised Petitioner of his Miranda rights, both orally and in writing, and the deputies explained that they were investigating Mrs. Foster's murder and her missing car.  Petitioner signed a portion of the form to indicate that he understood his rights, but he declined to sign the portion that waived those rights and indicated a desire to make a statement or answer questions.

Deputy Scott was asked at the hearing if Petitioner asked for a lawyer.  He said, "I believe he did say that he needed to talk to counsel."  Deputy Trammell testified that Petitioner made a reference to not having any idea what any of it was all about but ultimately, "He wanted to talk to his lawyer before he talked to us."  The deputies immediately stopped questioning Petitioner once he requested counsel.  Petitioner, though, began to ask them questions in what appeared to be an effort to determine what the deputies knew about the crimes.  Tr. 357-79.

Carla Whitstine of the Alexandria city police then took Petitioner to the Rapides Parish jail to book him on the parole violation warrant.  The jail policy required that booked prisoners have Miranda waivers, so Whitstine completed a Miranda advice form, which

Petitioner signed.  She did not question Petitioner.  Tr. 380-88.  Later that evening, Petitioner

was taken to the Natchitoches Parish Detention Center.

The next day, February 4, 2004, Judge Lewis Sams of Red River Parish signed a

warrant for Petitioner's arrest for unauthorized use of the victim's motor vehicle.  Red River

Deputy Johnny Taylor and Natchitoches Sheriff Victor Jones served the warrant on Petitioner

at the detention center.  Petitioner was brought to a room to visit with Deputy Taylor and the

Sheriff.  Deputy Taylor, who was fairly well acquainted with Petitioner, told him that they

were there to serve him with a warrant for unauthorized use of Mrs. Foster's car.  Taylor then

read Petitioner his <u>Miranda</u> rights from a preprinted form.  Petitioner signed to acknowledge

he understood his rights.  He also signed a second part of the form that was a waiver.  It

included the statements: "I understand what my rights are and elect to waive them.  I am

willing to answer questions and make a statement.  I do not want a lawyer."

The sheriff asked Petitioner if he wished to talk to them, and he said he did.  The

sheriff stated that Petitioner would need to make a written request before they could talk.

Petitioner then physically wrote and signed a note that stated, "I Roy Williams request to see

Johnny Taylor."  Petitioner never mentioned during this meeting that he wanted an attorney.

Petitioner told Taylor and the sheriff that he did not kill Mrs. Foster.  They replied that

they were not there to charge him with that.  Rather, they were charging him with

unauthorized use of the car.  Petitioner then said that he went to Mrs. Foster's house around

4:00 a.m., took a key out of a shed and used it to access the house and get the car key.  He

said he then left in the car, drove through Natchitoches without stopping, and went on to

Alexandria.  Petitioner was asked to describe his route, and it included him driving by the area where Mrs. Foster's body was found.  Petitioner said he rented the car to someone in Alexandria.  Sheriff Jones asked if Petitioner would give a written statement or speak on tape about the things he had just discussed.  Deputy Taylor recalled that Petitioner "stated that he would, but he would rather do it in the presence of a lawyer."  That was his first mention of an attorney during the meeting.  The interview ended at that point.  Tr. 389-400.

The next day, February 5, probation and parole officer Alvie Myers went to the detention center to serve Petitioner with a notice of preliminary hearing and advise him about the parole violation charges against him.  Myers testified that he entered the room and told Petitioner that he had some paperwork to go over.  Myers said that Petitioner replied that he "wanted to talk to me about his situation."  Myers said that he needed to get the paperwork taken care of first, and they began that review process.  Petitioner elected to defer a preliminary hearing on the parole revocation and agreed to remain in custody until the resolution of the unauthorized use of a movable charges.  Tr. 416-19.

After the parole-related paperwork was completed, Myers asked Petitioner if he still wanted to talk.  Petitioner said yes, so Myers asked one of the Natchitoches deputies for a Miranda warning form.  He read the form to Petitioner, who signed both the acknowledgment and the waiver that included language stating that he was willing to make a statement and answer questions and did not want a lawyer at that time.  Petitioner told Myers the story about taking the keys and said that Mrs. Foster was alive and asleep in her bed when he left in her car.  Petitioner then asked to speak with Sheriff Jones.  Myers told Petitioner that he

would have to make a request in writing, and Petitioner did so.  Tr. 422-24.  Sheriff Jones said that he then met with Petitioner and "mainly listened to him" as he told a version of events consistent with his prior statement.  At the end, Jones asked Petitioner if he wanted to give a written or taped statement.  Petitioner again said that he would "do it in the presence of an attorney."  Tr. 435-36.

Eight days later, on February 13, 2004, Detective Michael Wilson was at the jail when Petitioner got his attention, said he was in jail based on an accusation of killing someone, and asked to speak with Wilson.  The detective told Petitioner that he would need to make a written request through the records clerk if he wished to speak with him.  Petitioner made a written request and, on February 18, Wilson met with him.  He read Petitioner his <u>Miranda</u> rights, which Petitioner waived.  Petitioner repeated his story about taking the car but not killing anyone.  He said he wanted to talk to Wilson further, but he felt like he should talk to an attorney first.  Petitioner said he would re-contact Wilson if the attorney approved it.  The visit ended.  Several days later, Wilson booked Petitioner on the first-degree murder charge.  He advised Petitioner of his <u>Miranda</u> rights, and Petitioner did not make any statement.  Tr. 444-50.

Paula Allen, who had a relationship with Petitioner, told Red River Deputy Taylor that she had recently visited Petitioner, and Petitioner wanted to speak with Taylor again.  Deputy Taylor again insisted that Petitioner make a written request.  Petitioner wrote: "I request to see Johnny Taylor."  It was dated March 23, 2004 and signed by Petitioner.  Taylor made the visit and began with a reading of the <u>Miranda</u> warnings.  Petitioner signed the

acknowledgment and waiver portions of the form.  The two men, who knew each other, made some small talk, and Taylor asked Petitioner if he had talked with a lawyer.  Petitioner said that he had talked to a couple of them.  Taylor said that Paula Allen had told him that Petitioner wanted to see him.  Petitioner then responded by asking why everyone was looking to him as the suspect.  Taylor told him that he had a lot of evidence that would be presented in court and, even though Petitioner was his friend, he had a job to do.  Petitioner stated during the conversation that he could not stay in prison for the rest of his life.  Taylor replied that it was better than the death penalty.  He testified that Petitioner said "his kids would love him in their heart and God had forgave him."  Tr. 401-05.

### B. The Edwards Requirements

Miranda v. Arizona, 86 S.Ct. 1602 (1966) held that once a person in custody invokes his right to counsel, interrogation "must cease until an attorney is present."  At that point, "the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning."  Edwards v. Arizona, 101 S.Ct. 1880 (1981) found it inconsistent with Miranda to allow "the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."  101 S.Ct. at 1885.  The Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  101 S.Ct. at 1884-85.  An accused who requests an attorney, "having expressed his desire to deal with the police only through counsel, is not subject to further

interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 101 S.Ct. at 1885.  The Edwards rule is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights" and "ensures that any statement made in subsequent interrogation is not the result of coercive pressures." Minnick v. Mississippi, 111 S.Ct. 486, 489 (1990), quoting Michigan v. Harvey, 110 S.Ct. 1176, 1180 (1990).

### C. Analysis

The State does not dispute that Petitioner invoked his right to counsel on the evening of his arrest when he told Deputies Trammell and Scott that he wanted to talk to a lawyer. The question then is whether Petitioner initiated the later communications in which he made incriminating statements.  The Court explored a similar issue in Oregon v. Bradshaw, 103 S.Ct. 2830 (1983) where the suspect spoke with police but, upon being placed under arrest and advised of his Miranda rights, denied involvement in the crime and said he wanted an attorney before it went much further.  Sometime later the suspect was about to be transferred from one jail to another, and he asked an officer, "Well, what is going to happen to me now?" The officer answered that the suspect did not have to talk to him because he had requested an attorney.  The suspect said he understood and continued to talk to the officer about the case.  This led to the suggestion of a polygraph examination, which was conducted the next day after another reading of Miranda rights.  The examiner told the suspect that he did not believe he was truthful, after which the suspect confessed.

Justice Rehnquist wrote for a four-justice plurality that some statements, by either an accused or an officer, relating to routine incidents of custodial relationship will not generally "initiate" a conversation in the meaning of Edwards, but the suspect's question about what would happen to him "evinced a willingness and a desire for a generalized discussion about the investigation" so that there was no Edwards violation.  Justice Marshall wrote for another four-justice group that an Edwards waiver can be established "only when the accused himself reopens the dialogue about the subject matter of the criminal investigation."  Justice Powell concurred on the grounds that he found correct the trial court's determination that the suspect had knowingly and intelligently waived his right to counsel.

Petitioner in this case did not merely ask what would happen or make a general inquiry about his custody.  Rather, he specifically stated that he wanted to talk to the investigators and made handwritten requests each time to evidence that desire.  His initiation of conversation about the investigation was at least as clear as in the several cases collected in Justice Marshall's opinion where prisoners signaled desire to talk to police about their case.

A slight difference in this case is that some of the meetings were initiated by police, such as when Sheriff Jones and Detective Taylor served Petitioner with the warrant for unauthorized use of a movable or when parole officer Myers went to explain to Petitioner his parole charges and procedures.  It does not appear the Supreme Court has addressed a case where the defendant's initiation of communication closely follows an officer's statement to him.  A treatise that looked at lower court decisions states that the officer's statement in that

setting is examined to determine whether it is interrogation or a non-interrogatory statement such as a routine administrative statement.  Nissman and Hagen, Law of Confessions, § 6:35 (2d ed.).  There is no indication that the police actions in this case were not routine police procedures or that they were done in an effort to badger Petitioner into waiving his invoked right to counsel.  The uncontested evidence is that on each occasion Petitioner made it known that he wanted to talk about his case, and the officers each time responded by requiring both a written request for such communication and a written acknowledgment and waiver of Miranda rights before they would discuss the case with him.

This court is not reviewing the claim de novo but through the deferential standard that applies in habeas cases.  Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts.  Pape v. Thaler, 645 F.3rd 281, 287 (5th Cir. 2011). A state court makes an unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a

way that is not only incorrect but objectively unreasonable.  Renico v. Lett, 130 S.Ct. 1855, 1862 (2010).

Reasonable jurists conducting a de novo review could debate the application of Edwards to the facts of this case, and they did so in the divided state appellate court.  But this court cannot say that the state court's application of Edwards or other clearly established Supreme Court precedent not only wrong but so incorrect as to be objectively unreasonable. To the contrary, it is quite reasonable to conclude that Edwards was not violated when the defendant repeatedly initiated a desire to speak with the officers, made written requests to do so, and signed written waivers of his Miranda rights before speaking.  The record supports a reasonable determination that Edwards was not violated and valid Miranda waivers were obtained prior to each statement.

**Improper Venue**

At the time of the murder and when the charge was instituted, La. Code of Crim. Proc. art. 611 provided that trials were to take place in the parish where the offense was committed. "If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred."

Petitioner's attorneys filed a motion to quash on the grounds that Natchitoches Parish, where the body was found, was the only proper venue.  After a hearing (Tr. 461-73), the trial court denied the motion. Tr. 247.  The appellate court denied a pretrial writ application with a finding that the evidence supported a logical circumstantial inference that the victim did

not voluntarily leave her home in Red River Parish before she was later found dead in Natchitoches Parish. The victim's husband was bedridden, she did not leave him without care, and the defendant admittedly entered her home and stole her car shortly before her body was found. The victim never reported her car stolen or called anyone to watch her husband. This evidence indicated that the events that culminated in the victim's death began in Red River Parish. Tr. 287.

Petitioner later entered a guilty plea, reserving his right to appeal certain pretrial issues, which his attorney stated "would be the denial of a motion to suppress and change of venue," and the lack of a timely 72-hour hearing and appointment of counsel. There was an issue with venue, which led to a joint motion for change of venue to select a jury, so it is unclear if the defense intended to or properly preserved the right to appeal the improper venue issue. Counsel did not raise venue on direct appeal, but Petitioner filed a pro se brief in which he listed it as an issue. Tr. 567-71. The appellate court did not address the issue.

Petitioner later filed a post-conviction application. Its procedural path is not clear from the record before the court, but the issue reached the state appellate court at least twice. The court once faulted Petitioner for inexcusably failing to raise the venue issue on appeal, leaving the issue procedurally barred. The court added, however, that the record "demonstrates that venue was proper in Red River Parish." Tr. 895. At another time the appellate court stated that Petitioner argued that Red River Parish was not the proper jurisdiction, but he "failed to meet his burden" on the issue. Tr. 923.

Petitioner's arguments in the state courts occasionally mentioned the federal

Constitution in passing, but his substantive argument was that state venue rules were not applied properly.  The habeas statute provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law."  Swarthout v. Cooke, 131 S.Ct. 859, 861 (2011).  Accordingly, habeas relief is not available on the improper venue claim.  Other courts have rejected venue arguments presented in habeas petitions for this same reason.  Reynolds v. Cain, 2014 WL 688973, *6 n. 9 (M.D. La. 9014); Suratt v. Cain, 2008 WL 2073995 (W.D. La. 2008).

**Ineffective Assistance of Counsel**

### A.  Summary of the Claims; Incomplete Record

Petitioner was appointed half a dozen experienced criminal defense attorneys to represent him in his capital case.  They negotiated a plea bargain that helped him avoid the death penalty.  Petitioner nonetheless filed a post-conviction application that included conclusory assertions of ineffective assistance of counsel.  He complained that he wanted to go to trial and make the State prove its case, but his attorneys ignored his wishes and advised him to plead guilty, which he did solely to avoid the death penalty.  Petitioner complains that there were (unnamed) witnesses who would testify to his whereabouts at the time of the crimes.  He accuses his attorneys of not interviewing these witnesses or his mother.  Petitioner also alleged that there was scientific and forensic evidence, particularly a rape kit test, that could have been used to exonerate him.

Petitioner was asked early in the proceedings to demonstrate exhaustion of his state court remedies by presenting copies of his state court filings and rulings on his claims.  He claimed to have lost much of his documentation.  The State's brief does not contain record citations to track the post-conviction proceedings, but the court has found the appellate court's summary denial of a post-conviction ineffective assistance claim.  Tr. 923.  Despite what appears to be a lack of a complete record of the post-conviction proceedings from either party, the court is able to address the claims.

### B.  Petitioner's Burdens

To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that he suffered prejudice.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).  To show prejudice in a guilty plea case "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 106 S.Ct. 366, 370 (1985).

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold.  Schriro v. Landrigan, 127 S.Ct. 1933, 1939 ( 2007).  The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied

it.  The federal court's review is thus "doubly deferential."  <u>Knowles v. Mirzayance</u>,129 S.Ct.

1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be."  <u>Harrington</u>

<u>v. Richter</u>, 131 S.Ct. 770, 786 (2011).  Section 2254(d) "stops short of imposing a complete

bar on federal court relitigation of claims already rejected in state proceedings" and reaches

only "extreme malfunctions" in the state criminal justice system.  <u>Id</u>.  Thus, "even a strong

case for relief  does not mean the state court's contrary conclusion was unreasonable."  <u>Id</u>.

### C.  Analysis

Petitioner's complains that counsel did not interview witnesses who could have told

of his whereabouts at the time of the crime.  A habeas petitioner who alleges a failure to

investigate on the part of his counsel "must allege with specificity what the investigation

would have revealed and how it would have altered the outcome of the trial."  <u>Gregory v.</u>

<u>Thaler</u>, 601 F.3d 347, 352 (5th Cir. 2010).  To prevail on an ineffective assistance claim

based on uncalled witnesses, the applicant must name the witness, demonstrate that the

witness would have testified, set out the contents of the proposed testimony, and show that

the testimony would have been favorable.  <u>Id</u>.  Petitioner does not identify any of the

allegedly favorable witnesses, other than his mother, and he gives no indication of what

specific information they would have provided except to say they would have been "willing

to testify to his whereabouts" at the relevant times.

Petitioner complains that scientific and forensic evidence would have exonerated him.

He does not point to or describe any such evidence apart from the rape kit test.  The record

indicates that anal swabs from the victim matched Petitioner's DNA.  Petitioner offers no hint as to what was contained in the test that could have helped his case.

Petitioner asserts that he wanted to go to trial, but the record shows that Petitioner signed a form in which he stated complete satisfaction with his attorneys' representation and acknowledged that he was "pleading guilty of my own free will and accord."  Tr. 323-28. Petitioner made similar statements at his plea hearing that he was pleading guilty because he was guilty, that his plea was free and voluntary, and there were no threats or intimidation made in order to get him to plead guilty.  Tr. 500-04.

Petitioner offered the state court and this court nothing but conclusory assertions that more investigation or better use of evidence could have helped his defense.  He has offered no reason to believe that, had counsel done things differently, he would not have pleaded guilty and would have insisted on going to trial and facing the death penalty despite his admissions, two sources of DNA evidence linking him to the crimes, and the other circumstances.  Petitioner has not met his burden on these claims.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another

party's objections within seven (7) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 29th day of January, 2015.

Mark L. Hornsby
U.S. Magistrate Judge